## SPELLMAN v. RICHMOND &c. RAILROAD COMPANY.

1. PLEADINGS—EXEMPLARY DAMAGES.—Every cause of action is referrible to a class and must be properly pleaded. And so, whether the damages claimed are actual or exemplary must be stated in the complaint, and to the damages as stated the testimony must be confined and the jury restricted. Exemplary damages are proper where the invasion of the rights of a person is characterized by violence, fraud, malice, wantonness, or reckless disregard of social or civil rights.

2. EXEMPLARY DAMAGES.—The matter of exemplary damages in actions of tort stated—its history and development and its definition and illustration by text writers and decisions.

3. IBID.—COMMON CARRIERS.—The law of exemplary damages as against an individual and a corporation is the same, but the duty due by common carriers to passengers imposes a liability for the wilful wrong of a servant done in the course of his employment, where such liability may not attach in other cases; and the right to such damages may be affected by the contributory negligence of plaintiff.

4. IBID.—JURY.—In action to recover exemplary damages for ejecting a passenger from a railroad train, and under the evidence in the case, the trial judge did not err in submitting the issue of exemplary damages to the jury, nor in charging that plaintiff would be entitled to punitive damages if there was a wilful invasion of his rights, and he was ejected wilfully or without just excuse on the part of the conductor, with malice or unnecessary harshness.

5. EVIDENCE.—The complaint alleged that plaintiff's ticket had been extended in time under authority of a letter from C, defendant's division passenger agent, and the answer admitted that there had been an agreement to extend as alleged. Plaintiff testified that the station ticket-agent asked him if he had not a letter from C, and that plaintiff then presented this letter, whereupon such station agent changed the date of the limit on the ticket. *Held,* that the letter was admissible in evidence and was relevant to the matter in issue.

6. EVIDENCE—RULES AND CUSTOMS.—A printed rule of a railroad company is the best evidence of what such rule is. A custom of the company may be proved by parol, but what the consequences to the conductor would be if he violated such custom was irrelevant to the issues involved in this action by the plaintiff against the railroad company for damages sustained by the act of defendant's conductor.

7. AN EXCEPTION based upon a misconception of the judge's charge, and upon a matter as to which the jury could not have been misled, overruled.

MR. CHIEF JUSTICE MCIVER concurred only in the result.

Before NORTON, J., Anderson, December, 1890.

This was an action by Francis A. Spellman against the Richmond & Danville Railroad Company. To prove the letter of Mr. D. Cardwell, referred to in the opinion, plaintiff offered J. A. Brock as a witness, who, after examining the letter, said that it was type-written, but the letter Z written at the bottom, he thought, was the handwriting of Mr. Zealy, clerk in Cardwell's office. Plaintiff himself testified that it was received in answer to a letter to Mr. Cardwell asking for an extension of the ticket; that on asking the ticket agent at Newberry for the extension, the agent "said, 'Have you not a letter from Mr. Cardwell?' and I presented this letter through the window, and he took it and walked back to a file and examined some letters and came back and made that change on the ticket with pen and ink, and he handed them and the letter to me, and I purchased two new tickets, one for the doctor and one for Mr. Beatty."

Mr. Motte, the conductor, defendant's witness, being on the stand, the court ruled that if there was a printed regulation governing the extension of tickets, it must be produced, and defendant excepted. Afterwards this same witness was asked, "What would be the result to you if you had taken that ticket as it was?" and he answered, "There is no rule, but there is a custom, and that is, that I would have to pay the fare." He was then asked, "Would that have been the result of this ticket." Objection was made and sustained, and defendant excepted.

The judge charged the jury as follows:

*Gentlemen of the Jury:* The plaintiff here, Mr. Spellman, has sued the Richmond & Danville Railroad Company, alleging

that he was a passenger on the Columbia & Greenville division of said railroad June 4th, 1889, and that he was improperly ejected by the conductor, Captain Motte, and that by such ejectment he was damaged $2,000. The first question, gentlemen, is admitted: that the Richmond & Danville R. R. Co. was operating the Columbia & Greenville R. R., and they admit through their pleadings that he was put off by their conductor.

The first question is in regard to this ticket: is it a good ticket or is it not? The law is, that one who purports to be a passenger must either have a ticket or else he must pay his fare. The railroad company alleges that Mr. Spellman never had a ticket nor did he pay his fare. There is no dispute between the witnesses that the conductor, Captain Motte, asked the plaintiff to pay his fare and that he refused to pay his fare, and that question will not trouble you, I suppose. But the plaintiff alleges that he had this ticket, or one just like it, and that the ticket is a good ticket, and he alleges that the ticket is in proper form giving him the right to ride from Newberry to Anderson, according to the face of the ticket, and on the 4th of June, 1889. The plaintiff alleges that he presented this ticket and that it was rejected; the question is as to the validity of it. You will observe that this ticket is marked coupon returning, that it has upon its back the stamp purporting to be the stamp of the Anderson office here, and it says: "Richmond & Danville R. R., good for one passage only on trains stopping at destination from Newberry to Anderson;" then comes the disputed point: "May 31st" is one and "June 30" is the other, and "no stop over allowed," and signed by the passenger agent, James L. Taylor.

You have heard the testimony in regard to the proper form of railroad tickets. It is alleged in the pleadings and admitted in the answer, and therefore is to be taken as true: That this ticket was a good ticket until the 31st of May, 1889, and the allegation is that it was a genuine ticket up to that time, and that the alteration was made by an agent of the railroad company at Newberry with the intent to change the date on which it was permissible for the plaintiff to return to Anderson upon this ticket; that an agent represented to the plaintiff that this was the proper mode of changing. The first question then, gentlemen, for

your consideration: Was the agent authorized to make the change? The plaintiff presents to you what purports to be a letter from Mr. Cardwell, authorizing the agent to make an extension of the ticket. The complaint alleges, just as I have stated to you, that it was represented by the agent to the plaintiff that this was the proper alteration; it is alleged by the answer that the authority was given to make such a change on the ticket, but that it was never executed, thereby denying that this is such a ticket as would authorize the return to Anderson upon it on the 4th of June.

Now, you have heard the testimony in regard to what it takes to extend a ticket so that one can ride on it afterwards. We have heard nothing in the testimony in regard to a change of dates. That question seems to have been ignored, but only the testimony was offered as to what would be a proper form. You are to judge from that testimony whether this ticket was in the form required—whether any particular form was required; and whether, if no particular form was required, it is sufficient to indicate to the conductor or any one else that the holder was entitled to pass over the road on the date which is written upon it after the first riding, that is, on June 4th; if so, then you would go one step further and you would inquire whether or not the plaintiff was ejected from the cars. Then in that connection you would inquire what the manner of the ejectment was.

It is not in every case that the plaintiff, when he is entitled to recover, is entitled to recover more than compensatory damages, that is, damages that will compensate him for the injuries which he has sustained by reason of some wrong done him. There are cases, however, where the plaintiff is entitled to recover smart money—punitive damages. Where, for instance, in this particular case, if the plaintiff is entitled to recover at all, you will inquire whether there was wilfulness, whether there was malice, whether there was unnecessary harshness, and all of the circumstances accompanying the ejectment from the cars to determine whether or not punitive damages ought to be given. If you should conclude that punitive damages ought to be given, then you ought to inquire what amount would compensate him for the injury he has sustained. If, however, you should come to the conclusion that there was a

wilful invasion of the plaintiff's rights, that he had a good ticket, was entitled to be upon the cars, was entitled to ride upon this ticket from Newberry to Anderson, that he was put off wilfully and without just excuse on the part of the conductor; you take all of the circumstances in the case into consideration and see whether he ought or ought not to have what is known as punitive damages.

You take into consideration also, in forming your verdict, the fact that this ticket presented in this way is written over. Illustration of the law was used by counsel on either side by reference to a bank check. The difference between the presentation of a forged bank check and the presentation of this ticket to the conductor is this: the holder of a bank check, if he is unknown, must be identified; but this ticket does not appear to be the property of any particular person, and if it was a good ticket, it was good for Mr. Spellman, so long as he behaved himself, to ride upon it between these two points on that day; it makes no difference who held it. If it was a forgery, and it had been written without the authority of the railroad company, and he had presented it to the conductor, then the conductor would have been justifiable in excluding him from the cars, because it would then have been a ticket which had expired three or four days before, that would not entitle him to ride, and the forged ticket would not entitle him to ride on it.

The conductor therefore determined at his peril whether to let him ride or not, because if it was a forgery he was responsible to the railroad company for letting a passenger ride on a ticket that was not a good ticket. If it was good, he would be responsible to a passenger for refusing to allow him to ride on it. So, in either event, a responsibility was resting upon the conductor, whichever he did. Just as a cashier would pay a forged check at the peril of the bank. Or if he did not cash it and it was genuine, it would offend the holder of it. That is the difference between these two cases, and that is a circumstance to be weighed along with the other circumstances in this case. If the ticket agent had wilfully made this ticket out wrongfully, of course, that would be an element which would be considered by you in adding to the damages against the railroad company, but it is no

excuse for the conductor; it would be no excuse for the railroad company that a passenger had a ticket that was wrong, if it was wrong by reason of the mistake of the agent at Newberry. Where a passenger pays his money for a ticket, and by some oversight of the ticket agent some formality is omitted, and if by reason of the omission of that formality the conductor should eject a passenger from the train, alleging that he had no ticket, the conductor would not be excused for having made the ejectment.

But you are to take all of the circumstances into consideration and see whether there was an intentional or wilful violation of the rights of the plaintiff, and if there was an intentional and wilful violation of his rights, then you would give much greater damages than if the violation of his rights was purely unintentional; and if you should come to the conclusion that the ticket was wrong, but that it was wrong through the mistake of the agent at Newberry, and that the conductor, so far as what he did was right in the ejectment, yet the ejectment was attributable to the company, whether the fault was the fault of the conductor or the ticket agent, the company would be equally responsible for the mistake of the one or the other. But you must take all of the circumstances into consideration, and you are to judge of the fault of the company just as you would judge of the fault of the individual.

I do not know that I can help you any farther. It is not material what the plaintiff or the conductor believed was the liability of the parties after the transaction. That could have no influence with you in forming your verdict, except so far as it influenced you to believe that the parties had knowledge of right or wrong at the time of the transaction. Some allusion was made as to putting off at a station. The law entitles a conductor to put a passenger off at any place, whether it was a station or not, and you can take that into consideration, so as to add to or diminish from the amount of damages you may find. Allusion has been made where a verdict was found in a reported case of $3,000 for putting off of a railroad train. I mention that, as it was argued to help you to come to a conclusion in this case. The circumstances in that case have not been all developed in this case. The statements that you believe in the testimony will be your guide in coming to a conclusion in this case as to the amount

of damages that the plaintiff will be entitled to recover, if he is entitled to recover at all.

Mr. Orr: The only evidence of a passenger's right to ride is the passenger's ticket.

The Court: I have already charged you that, gentlemen, that if this was a good ticket, and presented, it authorized the person to ride upon it; if it was not good he could not ride upon it; if it is a good ticket it is a ticket, if it is not a good ticket it is not a ticket.

Mr. Orr: I would ask your honor to charge as to the material part of an alteration.

Mr. Murray: If it was shown that it was authorized by the party making the alteration, that does not vitiate it.

The Court: If there was no authority to make the change it would be no ticket, it would be a forgery and invalid. It devolves upon the plaintiff to prove that, and it is for you to say whether he has proved it. If it was authorized it would be a good ticket, if it was not authorized it would be a bad ticket.

Verdict was for plaintiff for $600, and defendant appealed.

*Mr. T. P. Cothran*, for appellant.

*Mr. E. B. Murray*, contra.

March 16, 1892. The opinion of the court was delivered by

MR. JUSTICE POPE. Francis A. Spellman, the plaintiff, while having in his possession a ticket of the defendant, entitling him on its face to travel from Newberry to Anderson, in this State, at any time up to the 30th June, 1889, was, on the 4th day of June, ejected from a passenger car of the defendant by a conductor employed by defendant. This action was brought by him to redress said wrong. In his complaint, amongst other things, the plaintiff alleged:

"2. That on the 25th day of May, 1889, the defendant sold the plaintiff a round trip ticket from Anderson to Newberry and return over a portion of said railroad, so controlled and operated by it, for the sum of two and 70–100 dollars, which sum plaintiff

31—35

paid the defendant, by which ticket it contracted to convey the plaintiff in one of its passenger cars from the city of Anderson, S. C., to the city of Newberry, S. C., and to carry him back to the said city of Anderson at any time up to May 31st of said year. That the said defendant, by direction of D. Cardwell, its division passenger agent, extended the time of the plaintiff in which to return, and on the fourth day of June, 1889, when plaintiff was ready to return, he presented the said ticket to the agent of the defendant at Newberry, who changed the date of return on the ticket and returned it to plaintiff, representing that he had properly altered the ticket to enable plaintiff to return to Anderson upon the same. That upon the faith of such action, and pursuant to the conditions of said ticket, as so extended, the plaintiff on said fourth day of June, as he had a right to do, entered the cars of said defendant and started to return thereon to Anderson, S. C.

"3. That while he was such passenger, between the towns of Newberry and Ninety-Six, the conductor of said train, as the agent of the defendant, refused to carry the plaintiff on said ticket and forcibly ejected him from said train. That in so doing the defendant committed an assault and battery of a high and aggravated nature upon the plaintiff by pulling him out of his seat down the aisle of said car, and forcibly pushing him off of the platform thereof in the presence of numerous passengers, and injured the reputation of the plaintiff by representing to them that he was trying to cheat the said company by attempting to ride upon a ticket which purported to be changed, but that such change was without the authority of the defendant, thereby charging plaintiff with attempting to perpetrate a fraud upon defendant, and imputing to him the crime of forgery." Wherefore he was damaged in his person and reputation two thousand dollars, for which he asked judgment.

In the answer of defendant, amongst other things, it is alleged: "2. Answering paragraph two, it says it admits the purchase of the ticket as alleged, but denies that time of said ticket was extended, and admits that the time was agreed to be extended as alleged, and that it was not properly extended because of a mistake of defendant's agent at Newberry, but that said mistake was caused

by negligence of plaintiff. 3. Answering paragraph three of complaint, defendant admits that defendant's agent refused to carry plaintiff and ejected him, but denies that said agent was wrong in so doing, and denies that he committed an assault, or that he charged plaintiff with attempting to cheat the company, or attempting to perpetrate a fraud, or in any way imputed to him the crime of forgery. Defendant denies that the plaintiff has been damaged."

The action was tried upon these pleadings and the testimony that was adduced at the hearing before Judge Norton and a jury, in the Court of Common Pleas for Anderson County, on the 24 December, 1890. Verdict for plaintiff for $600 damages. After judgment thereon, defendant appealed upon the following grounds:

1. Because the rule of exemplary damages was not applicable to this case under the testimony, and it is respectfully submitted that his honor erred in charging the jury that they might consider the question of exemplary damages in making up their verdict.

2. Because not only was the overwhelming weight of the testimony against the idea of influence or malice on the part of the conductor and other employees of the defendant; but there was absolutely no evidence whatever of wilfulness or malice on their part, and such being the case, it is submitted that this court has the power to grant a new trial.

3. Because it is respectfully submitted that his honor erred in admitting the alleged Cardwell letter in evidence without legal proof of the execution of the same.

4. Because it is respectfully submitted that said letter was incompetent, even if it had been properly proved.

5. Because it is respectfully submitted that his honor erred in not allowing the witness Motte to testify as to whether or not the tickets presented to him by plaintiff were good in the condition in which they were when presented, said Motte being an expert.

6. Because even if said Motte had not been an expert, it is respectfully submitted that his testimony on said point was competent, if he knew of any rule invalidating such ticket.

7. Because, it is respectfully submitted, that his honor erred

in not allowing the witness Motte to testify as to what would have been the consequences to him if he had received these tickets, in the condition in which they were presented, without first making inquiry of the proper authorities.

8. Because his honor charged the jury: "We have heard nothing in the testimony in regard to a change of dates. That question seems to have been ignored, but only the testimony was offered as to what would be a proper form." While the witness Motte testified: "I told him (the plaintiff) that I could not take the ticket; that the date had been changed." And again: "I am not allowed to accept any ticket with an alteration on it like that." And again, he was asked: "You told him it was not good?" Answer: "Yes, sir." "It was not good because the dates had been changed?" Answer: "Yes, sir." And still again: "I told them that the date of the ticket had been changed, and he said he had orders, and I asked him to show me the letter, and he said he could not do it."

The facts upon which both the plaintiff and defendant relied in the court below seem about these: The plaintiff and others from Anderson, desiring to attend a tournament to be participated in by the volunteer firemen at Newberry, procured from the defendant tickets that would be good to go and return from 25th May until the 31st of May, inclusive, such tickets being issued by defendant's agent at Anderson. While in Newberry, owing to the illness of one of the young men from Anderson. application was made to D. Cardwell, general division ticket agent of defendant, to extend the tickets beyond the 31st of May, so as to enable the holders to remain some days longer with the sick comrade. Mr. Cardwell wrote a letter, authorizing the agent at Newberry to make the extension of the tickets. On the 4th of June, 1889, the plaintiff carried his own ticket and that of Mr. Sherard to such agent at Newberry to be extended. The extension was made, after the Cardwell letter was shown the agent, by such agent erasing the words and figures "31st of May" on such ticket and endorsing thereon the words and figures, "30th of June." At the same time this was done, the plaintiff purchased tickets for his sick comrade and his attending physician.

The party of four entered on that day the passenger coach of

defendant to return to Anderson. Beyond Newberry, on the way to Ninety-Six, upon the request of the conductor, Mr. Motte, the plaintiff exhibited four tickets, two for the sick gentleman and his physician and one each for himself and Mr. Sherard. The conductor objected to receiving the last two upon the ground that the dates had been altered. He was promptly informed by the plaintiff that the change had been made by the agent at Newberry under a letter of advice from Mr. Cardwell. The conductor asked to see this letter, but plaintiff told him it had been left at Newberry. The conductor then demanded the fare to be paid, or otherwise he would put them off. The plaintiff told him he did not have the money, but assured him the ticket was good, and that he could satisfy himself as to the same as soon as he reached a telegraph office on the line of the road. The conductor proposed to take them to Ninety-Six if they would agree to pay him for their passage in case he learned there by telegram that the tickets were not good. They declined this proposition, protesting that the tickets were good. Thereupon the conductor stopped the train and forcibly ejected both of them (the plaintiff and Mr. Sherard), saying, "Come on, young man," as he seized him by the arm and carried him out of the car. All this occurred in the presence of a number of passengers. When ejected, it was raining and not near a station. The passengers so ejected again entered the passenger car of their own accord, and were carried to Ninety Six when the conductor learned that the extension of the tickets was made by the agent of the defendant.

There were questions raised on the trial as to what was the legal mode of extending tickets, and what responsibility a conductor assumes by accepting a ticket that is invalid under the rules of the railroad company. They may be considered hereafter. There was no motion made for a non-suit. No written requests to charge were made to his honor the presiding judge. Some oral requests were made, to which he acceded, and seemingly satisfied both parties therewith, as we hear of no complaint from either party to the controversy as to such charge upon the matters embraced in such oral requests.

We will now examine the grounds of appeal. The leading questions raised by the appellant are embodied in the first and

second grounds of appeal. In this way are suggested an inquiry by us, *first*, as to the doctrine of exemplary damages and what limitations there are affixed by law, and, *second*, if the Circuit Judge failed to correctly interpret this doctrine or improvidently allowed it, under the testimony adduced at the hearing, to be applied to the case at bar. ·

The cause of action in cases of exemplary damages is as clean cut as other different causes of action. Every cause of action is referrible to some class; it is but a species of some particular group. For illustration, let us take the old form of action known as "trover," which was a generic name applied to those torts arising from one individual unlawfully converting any particular piece of ·personal property while the same was owned by another. Whenever these elements entered into and made up a cause of action, it was in "trover," and in such cases actual value of the property was the limit to the recovery; if the jury gave more, the verdict would be set aside. *Guerry* v. *Kerton*, 2 Rich., 507. So it is in those torts where the cause of action is the invasion of the rights of a person, natural or artificial, where such invasion is characterized by violence, fraud, malice, wantonness, reckless disregard of social or civil rights, etc. And it is just as essential that such causes of action be properly pleaded as those belonging to any other class. If care is taken to observe this rule, very much of the confusion which exists as to this class of cases will be cleared up.

In reading some cases, we observe that the presiding judge, in his charge, speaks of the necessity of the jury only giving *actual* damages if they take one view of the case, and if they adopt another view of the same case, the jury must give exemplary damages. According to our view of the law, this is all wrong, for where a cause of action set up in the complaint is for exemplary damages, such exemplary damages, and *none other*, should be awarded; if the plaintiff fails by his proofs to establish such damages, the verdict should be for the defendant. Where the cause of action set up in the complaint is for actual damages, the plaintiff is entitled to recover nothing but actual damages. A different view would defeat the very object of pleadings. Of course, these observations are just as pertinent to the testimony offered

in a case; it should always be restricted to that cause of action set up in the pleadings. In the case at bar, these requirements have been fully met by both plaintiff and defendant, both in the pleadings and proofs thereunder. The plaintiff here sues for exemplary damages, and the defendant meets him on that ground.

We do not know that we can better convey our apprehension of the doctrine of exemplary damages than by quoting a few text-writers and from a few decisions of the courts; but before doing so, it may not be amiss to give a slight reference to the history of the matter under discussion. The distinguishing feature of torts, as applied to legal actions, is that they never arise *ex contractu*. Actions *ex delicto* and actions *ex contractu* are never mingled in the law. They ever stand apart. Actions for the redress of torts always sound in damages, and such damages may be either actual or exemplary. With the latter class we will deal just now. The full development of the law pertaining to this subject has not been without its struggles. There were those who felt that nothing like punishment should be admeasured on the civil side of the court, even in that class of offences not provided for in the criminal code. So long as damages for torts were not to include the idea of punishment they were content. However, the opposing view at length generally prevailed. Both in England and in this country, courts administered this redress of wrongs by giving damages as a compensation to the person affected as well as to punish the wrong-doer. Our own judicial history, in its early stages, bears witness to the adoption within our State borders of these principles of law. Nor has there been any deviation in this regard since the beginning. A long line of unbroken precedents, from our State Reports, were cited by the present Chief Justice in delivering the judgment of this court in the case of *Duckett* v. *Pool* (34 S. C., 323), re-enforced by apt quotations from the cases themselves.

This branch of the law was enlarged in its application, for at first it only applied to natural persons, but after a time, to meet the necessities resulting from our civilization and the rapid expansion in the industrial world, it was extended to corporations. This certainly was a stride for the law. Inasmuch as corporations are only artificial persons, deriving their existence alone from

man, *proverbially soulless*, how could intention, *animus*, capacity to recognize good from evil, be ascribed to them? But so it has been held. The crimes of assault and battery of a high and aggravated nature, libel, slander, the lesser offences of negligence, carelessness—offences in which the intent plays such a conspicuous part—have all been ascribed to corporations, and when proved on trial, such corporations have been made to respond in heavy damages. *Quigley* v. *Philadelphia, Wilmington, and Baltimore R. R. Co.*, 21 How., 207; *Stevens* v. *Midland Counties Railway Co.*, 10 Exch. Rep., 356; *Whitfield* v. *Southeastern Railway Co.*, El., Bl. & El., 115. The foregoing were amongst the earliest cases in this direction. If either of the parties to this appeal should desire to read a fierce criticism of such a result, their attention is directed to the dissenting opinion of Mr. Justice Daniel, as found at pages 219–20–21 of 21 Howard's Reports. Since the beginning, however, there have been no steps backward in this policy of the law, as our own reports for the past twenty years will show.

Mr. Pierce, in his work on Railroads, at page 305, says: "Such damages, exceeding compensation for the injury, are not allowed for mere negligence, and they are not confined to injuries which are intentional, or prompted by malice or an evil purpose, or caused by such wilfulness or recklessness of conduct as raises a presumption of conscious indifference to the rights of others." Mr. Thompson, in his work on Negligence, page 1254, says: "Exemplary, punitive, vindictive damages or smart money, as they are called indifferently, are given by way of punishment of the wrong committed by the defendant, and with a view of deterring others from like offences. Whether or not the case is one that justifies exemplary damages, is a question for the court to determine in its instructions to the jury. In the discharge of this duty the court looks to the *animus* of the defendant that accompanies the injury. If it was wantonly and wilfully inflicted, or with such a gross want of care and regard for the rights of others as to justify the presumption of wilfulness or wantonness, the court will instruct the jury that they are at liberty to find for the plaintiff, in addition to compensation for the injury actually sustained, such a sum as the circumstances justify."

In Wood's Mayne on Damages, 59, it is said: "But in order to warrant a jury in giving vindictive damages, something more than mere unlawfulness must be shown; there must be evidence of malice, fraud, wantonness, or oppression. Actual malice need not exist to entitle a party to punitive damages; if the act is wantonly or recklessly done, vindictive damages may be given, although there is no actual malice. *Any act conceived in a spirit of mischief, or in evident disregard of the rights of others, or of civil or social obligations*, come within the idea of a malicious act." The Supreme Court of the United States, in the case of *Philadelphia, Wilmington, and Baltimore R. R. Co.* ads. *Quigley*, 21 How., 207, said: "In Day *v.* Woodworth, 13 Howard, 371, this court recognized the power of a jury, in certain actions of tort, to assess against the tort feasor punitive or exemplary damages. Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the *malice spoken of in the rule is not merely the doing of an unlawful or injurious act*. The word implies that the act complained of was *conceived in the spirit of mischief or of criminal indifference to civil obligations*."

The decisions of this court fully recognize the soundness of the foregoing quotations. *Palmer* v. *Railroad Company,* 3 S. C., 597; *Hall* v. *Railway Company,* 28 *Id.*, 261; *Quinn* v. *S. C. Railway Co.*, 29 *Id.*, 381; *Duckett* v. *Pool, supra,* 34 *Id.*, 323, and cases there cited. Thus, it is manifest that our first statement of what is implied in the doctrine of our law regarding the scope and definition of exemplary damages was in every way faithful.

A few words as to any limitation in the application to cases when exemplary damages may be claimed. It should be remarked that natural and artificial persons are on the same footing.

3    The law, however, increases the liability of common carriers somewhat when any antagonism arises between the conductors and passengers growing out of an abuse of the power of the conductor, for the law holds the common carrier to a protection of the passenger, not only as against third persons, but as well as against its servants. *Goddard* v. *Grand Trunk Rail-*

*way*, 57 Maine, 202. In the case last cited, the court said: "It may be true, that if the carrier's servant wilfully and maliciously assaults a stranger, the master will not be responsible; but the law is otherwise when he assaults one of his master's passengers. The carrier's obligation is to carry his passenger safely and properly, and to treat him respectfully, and if he entrusts this duty to his servants, the law holds him responsible for the manner in which they execute the trust. The law now seems to be well settled, that the carrier is obliged to protect his passenger from violence and insult from whatever source arising. He must not only protect his passengers against the violence and insults of strangers and co passengers, but *a fortiori* against the violence and insults of his own servants."

One limitation to responsibility arises from contributory negligence of the plaintiff. *New Orleans &c. R. R. Co.* v. *Statham*, 42 Miss., 607. Another may be found in the fact, that usually such liability must arise, where the tort feasor is a servant, from acts done in the course of his employment. Pierce on Railways, 277. This doctrine is there laid down: "The company is liable for the acts of its servants in the course of their employment, both in the rightful use and in the abuse of the powers conferred upon them; and when they keep within the course of their employment, it is responsible for their negligence or wrongful act, although they are acting against its instructions or even wilfully. This rule applies where the servant exercises a power conferred by the company on an occasion or under circumstances where its exercise is unlawful, as where a conductor or other servant, having the power to remove passengers from the company's carriages, who have no right to remain in them, removes a passenger who has such right." *Moore* v. *Fitchburg R. R. Co.*, 4 Gray, 465. But time is too precious just now, in view of the other labors of this court, to pursue this branch of the inquiry any further.

Second. Let us see if the Circuit Judge here failed to correctly interpret this doctrine, or improvidently allowed it, under the testimony here, to be applied to the case at bar. Under the decisions of this court, a Circuit Judge is bound to submit a case to the jury when there is any testimony to support the cause of action. Here, confessedly, was an action as

framed by the pleadings for exemplary damages, and if there was any testimony given in support of this, the Circuit Judge was powerless; the responsibility was upon the jury. We have examined the "Case," and we see no error in the trial judge in this regard. Nor are we dissatisfied with his charge of the law relating to exemplary damages. No requests to charge were made that he failed to meet. As to the request addressed to us, to grant a new trial because of the absence of testimony, it must be denied, because we cannot so conclude in the face of the trial judge's action or in the face of the testimony itself. We must dismiss these two grounds of appeal.

As to the third ground of appeal. We fail to find any merit here. The plaintiff in his complaint referred to Mr. Cardwell's considerate interference in his behalf by giving directions for the extension of the tickets by defendant's agent at Newberry. The defendant in his answer admits "That the time was agreed to be extended *as alleged.*" The witness Spellman in his testimony states that the ticket agent at Newberry said, "Have you not a letter from Mr. Cardwell?" and "I presented *this letter* to him." The agent at Newberry acted on this letter. It was fully identified at the trial, and did not need any proof as to its execution, though that was done, in a manner, by the witness Brock. It was a fact, that this letter purporting to be a letter from D. Cardwell was used, and from this standpoint it was admissible without any regard to proof of its execution. This ground of appeal must be dismissed.

Now, as to the fourth ground of appeal. The letter of D. Cardwell was pertinent to the inquiry in the court below, because it had become inseparably interwoven with the transactions. For the reasons set out in considering the third ground of appeal, this exception must be overruled.

As to the fifth, sixth, and seventh grounds of appeal. Inasmuch as they all relate to the witness Motte, we will consider them in a group. *Is it a fact,* that Motte did not testify as to whether the tickets were good in the condition presented to him for acceptance, or that he was not allowed to testify because no expert, or that he did not testify as to what consequences would be visited upon him if he had accepted the

tickets? The first two of these questions might be answered by this court by simply reading the words of the appellant set out in its eighth ground of appeal. But the case speaks for itself. The only exception taken by appellant to any ruling of the Circuit Court on the matter of Motte's testimony arose in this way: The question was presented as to whether, if a witness is asked if a ticket as extended is good, and he declares that there is a printed rule regulating such extensions, and such printed rule is not produced, he can answer that question. The court ruled that he could not, and the court was right. But fortunately for the defendant, it afterwards occurred to this witness that he was mistaken as to the existence of any such printed rule—that it was only a custom. And he testified fully. The only hindrance was when the question was asked, "What would have been the result of this ticket?" Plaintiff objected, which objection was sustained, and defendant excepted. This objection was well taken. How could this witness tell what would take place in the future in the conduct of any one else? These grounds of appeal must be dismissed.

So far as the eighth ground of appeal is concerned, we feel that it has arisen from a misconception by the appellant of the judge's meaning when he used the language complained of: "We have heard nothing in the testimony in regard to a change of dates; that question seems to have been ignored, but only the testimony was offered as to what would be a proper form." It is evident the judge could not have intended to state what the pleadings admitted that the words "31 May" had been changed and "30 June" inserted on the tickets. The only contention here was as to the effect of this change. The witness Spellman in his testimony explained it. And the witness Motte also spoke of it. What the judge meant was that no *contest* existed in *the testimony* as to the change of the dates; that the only contest on that line was as to the proper form of the extension of a ticket. That this is the true explanation, read from the judge's charge: "You are to judge from that testimony whether this ticket was in the form required, whether any particular form was required, and whether, if no particular form was required, it is sufficient to indicate to the conductor or any one else that the holder was

entitled to pass over the road *on the date which is written upon it after the first riding, that is, on June 4th.*" The first riding had been on 25 May. The rule here is, that the whole charge must be considered and not extracts made therefrom here and there. It is very evident that no influence detrimental to appellant could have arisen by the use of this language by the judge, especially as immediately afterwards he let his true meaning appear. This ground of appeal must be dismissed.

It is the judgment of this court, that the judgment of the Circuit Court be affirmed.

MR. CHIEF JUSTICE McIVER. While not assenting to all of the general observations found in this opinion, I concur in the result. It is also due to Mr. Justice Pope that attention should here be directed to the correction or modification of what seems to be an approval of the doctrine stated in the quotation from Thompson on Negligence, p. 1254, made by him in the opinion filed at the present term in the case of *Samuels* v. *R. & D. Railroad Company*,[1] prepared by the same justice.

MR. JUSTICE McGOWAN. I concur.